

# IN THE
# TENTH COURT OF APPEALS

## No. 10-05-00197-CV

**RORY LEWIS, M.D.,**

                                      **Appellant**

 **v.**

**DEWAYNE FUNDERBURK, AS NEXT**
**FRIEND OF WHITNEY FUNDERBURK,**

                                      **Appellee**

---

### From the 87th District Court
### Limestone County, Texas
### Trial Court No. 27,143-B

---

## MEMORANDUM OPINION

---

Dewayne Funderburk filed a medical malpractice suit against Dr. Rory Lewis alleging that Lewis improperly treated his daughter Whitney's fractured wrist. The trial court denied Lewis's motion to dismiss premised on Funderburk's failure to serve a sufficient expert report under section 74.351 of the Civil Practice and Remedies Code. Lewis contends in two issues that the court should have granted the motion to dismiss because: (1) Funderburk's expert, a family practitioner, is not qualified to render an expert opinion on orthopedic care; and (2) the report is conclusory and insufficient to

establish causation. Lewis also contends that, if we sustain either of these issues, we should remand the case to the trial court with instructions to award costs and attorney's fees.

On original submission, this Court, with Chief Justice Gray dissenting, dismissed the appeal for want of jurisdiction, holding that Lewis's notice of appeal was untimely. *See Lewis v. Funderburk*, 191 S.W.3d 756 (Tex. App.—Waco 2006). The Supreme Court reversed and remanded the case to this Court for consideration of the merits of Lewis's claims.[1] *See Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008).

We will: (1) reverse and render a judgment of dismissal; and (2) remand this cause to the trial court for a hearing solely to determine the amount of attorney's fees and costs to be awarded.

**Standard of Review**

This Court and others have regularly stated that we review a trial court's decision regarding the adequacy of a section 74.351 expert report under an abuse-of-discretion standard. *See, e.g., Williams v. Mora*, 264 S.W.3d 888, 891 (Tex. App.—Waco 2008, no pet.); *Packard v. Guerra*, 252 S.W.3d 511, 515 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Mosely v. Mundine*, 249 S.W.3d 775, 778 (Tex. App.—Dallas 2008, no pet.); *Spitzer v. Berry*, 247 S.W.3d 747, 749 (Tex. App.—Tyler 2008, pet. denied). Lewis suggests that the appropriate standard of review is "arguably" de novo. He cites an

---

[1]    Lewis presented six issues on original submission. *See Lewis v. Funderburk*, 191 S.W.3d 756, 758 (Tex. App.—Waco 2006), *rev'd*, 253 S.W.3d 204 (Tex. 2008). The Supreme Court effectively decided Lewis's first three issues against him. *See Lewis*, 253 S.W.3d at 208. Lewis has filed a supplemental brief on remand narrowing his issues accordingly. *See* 10TH TEX. APP. (WACO) LOC. R. 19 (providing for filing of supplemental briefs upon remand from Supreme Court or Court of Criminal Appeals).

article in the *Texas Bar Journal* and two cases applying a de novo standard. *See* George C. Hanks, Jr. & Rachel Polinger-Hyman, *Redefining the Battlefield: Expert Reports in Medical Malpractice Litigation After HB 4*, 67 TEX. B.J. 936, 943 (2004); *Univ. of Tex. Health Science Ctr. v. Gutierrez*, 237 S.W.3d 869, 871 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *Kendrick v. Garcia*, 171 S.W.3d 698, 703 (Tex. App.—Eastland 2005, pet. denied).

The article does suggest that, because the Texas Legislature employed slightly different language in Chapter 74 of the Civil Practice and Remedies Code than its predecessor the Medical Liability and Insurance Improvement Act (TEX. REV. CIV. STAT. ANN. art. 4590i), "an argument could be made that under Section 74.351, another, more rigorous, standard should be applied." Hanks & Polinger-Hyman, *Redefining the Battlefield*, 67 TEX. B.J. at 943. Despite this suggestion, however, Texas courts have continued to apply the abuse-of-discretion standard. *See Williams*, 264 S.W.3d at 891; *Packard*, 252 S.W.3d at 515; *Mosely*, 249 S.W.3d at 778; *Spitzer*, 247 S.W.3d at 749.

The two cases cited by Lewis involved the issue of whether the defendant had been "served" with an expert report within the meaning of section 74.351(a). *See Gutierrez*, 237 S.W.3d at 871; *Kendrick*, 171 S.W.3d at 703. In both cases, these courts construed the term "serve" to mean service as defined by Rule of Civil Procedure 21a. *See Gutierrez*, 237 S.W.3d at 872; *Kendrick*, 171 S.W.3d at 704. Because both cases involved an issue of statutory construction, a de novo standard of review was mandated. *See Kendrick*, 171 S.W.3d at 703 (citing *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003)) (other citation omitted).

The Fourteenth Court of Appeals has summarized the applicable standard of review as follows:

> We review a trial court's decision on a motion to dismiss under Texas Civil Practice and Remedies Code section 74.351 for an abuse of discretion. When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. However, to the extent resolution of the issues presented requires interpretation of the statute, we review the order under a de novo standard.

*Packard*, 252 S.W.3d at 515 (citations omitted). We believe this to be a proper summary of the applicable standard. *See Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 291 (Tex. App.—Fort Worth 2008, pet. filed) (declining to apply de novo standard "absent any controlling authority"); *Kendrick*, 171 S.W.3d at 702-03 (same).

To determine the adequacy of an expert report under section 74.351, the inquiry is limited to the four corners of the report. *Williams*, 264 S.W.3d at 891 (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001)). With respect to the proffered expert's qualifications, the curriculum vitae may also be considered. *Mosely*, 249 S.W.3d at 779; *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see In re McAllen Med. Ctr., Inc.*, 51 Tex. Sup. Ct. J. 1302, 1304, 2008 Tex. LEXIS 759, at *7-8 (Tex. Aug. 29, 2008).

### Expert Qualifications

Lewis contends in his first issue that Funderburk's expert, Dr. Larry Hughes, is not qualified to provide expert opinion regarding orthopedic care because Hughes is a family practitioner.

Section 74.401 establishes the qualifications for an expert witness in a malpractice suit against a physician. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401 (Vernon 2005). Subsection (a) provides:

> In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:
>
> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* § 74.401(a).

Lewis's complaint focuses primarily on the third requirement of section 74.401(a), but it also includes to a degree a challenge to Hughes's showing that he has knowledge of the accepted standard of care, which is the second requirement of this statute.

Subsection (a)(2) provides that a proffered expert must have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." *Id.* § 74.401(a)(2). "The statute does not focus on the defendant doctor's area of expertise, but on the condition involved in the claim." *McKowen v. Ragston*, 263 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *accord Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no

pet.); *see also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003); *Baylor Univ. Med. Ctr. v. Biggs*, 237 S.W.3d 909, 915 (Tex. App.—Dallas 2007, pet. denied).

Subsection (a)(3) examines the proffered expert's training and experience. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(3). Subsection (c) provides:

> In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and
>
> (2) is actively practicing medicine in rendering medical care services relevant to the claim.

*Id.* § 74.401(c).

Possession of a license to practice medicine does not automatically qualify the possessor as an expert on every medical question. *Roberts*, 111 S.W.3d at 121; *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996); *McKowen*, 263 S.W.3d at 163. Conversely, the proffered expert need not necessarily practice in the same field as the defendant physician to qualify as an expert for that case. *See Roberts*, 111 S.W.3d at 121; *Broders*, 924 S.W.2d at 153; *McKowen*, 263 S.W.3d at 165; *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *Blan*, 7 S.W.3d at 745-46.

If the subject of inquiry "is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields." *Broders*, 924 S.W.2d at 154; *accord Keo*, 76 S.W.3d at 732; *Blan*, 7 S.W.3d at 745; *see also Roberts*, 111 S.W.3d at 121-22. Similarly, if the subject of inquiry "is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as

to the standard of care." *McKowen*, 263 S.W.3d at 165; *Keo*, 76 S.W.3d at 732; *Blan*, 7 S.W.3d at 745-46. "The test to determine if a particular expert is qualified is rooted in the expert's training, experience and knowledge of the standards applicable to the 'illness, injury, or condition *involved in the claim*.'" *Blan*, 7 S.W.3d at 746 (quoting Tex. Rev. Civ. Stat. Ann. art. 4590i, § 14.01(a)); *accord McKowen*, 263 S.W.3d at 162; *Keo*, 76 S.W.3d at 732; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(2).

Here, Hughes's four-page CV provides extensive information regarding his education, training, and experience. *Cf. McAllen Med. Ctr.*, 51 Tex. Sup. Ct. J. at 1304, 2008 Tex. LEXIS 759, at *7 ("The curriculum vitae the plaintiffs submitted for Dr. Brown was a model of brevity."). Hughes is board certified in family practice by the American Osteopathic Board of General Practice. He received his doctorate in osteopathic medicine in 1980 from the Kirksville College of Osteopathic Medicine in Missouri. He did a one-year internship at the South Bend Osteopathic Hospital in South Bend, Indiana. He established a family practice in Indiana after his internship and maintained that practice for eleven years before moving to Limestone County in 1992. He has continued to practice medicine in Limestone County since then.

Hughes stated in his CV that his "special medical interests" are endoscopy of upper and lower GI tracts, asthma/COPD, migraine headaches, chronic pain and Alzheimer's disease. Because of his general practice, however, he "continue[s] to treat, evaluate, and refer, when necessary, orthopedic problems, including wrist fractures." He also stated in his report that he "maintain[s] and utilize[s] authoritative texts to assist me in the diagnosis and treatment of orthopedic cases." *See Roberts*, 111 S.W.3d at

122 ("Finally, Dr. McGehee consulted several peer-reviewed medical journal articles and textbooks on pediatric neurology.").

Lewis argues that Hughes is not qualified because his "CV is silent as to any orthopedics interest or expertise."  He also complains that Hughes's "limited knowledge and experience is born out" by the fact that his opinion on the applicable standard of care in this case is based solely on his reference to "the textbook 'Practical Orthopedics 5th edition' by Mercier."  Finally, he contends that Hughes is not qualified because his report does not indicate that he has any specialized knowledge regarding the particular treatments and procedures Lewis employed in treating the fractured wrist.

Lewis has provided the Court with a copy of purported excerpts from the textbook at issue in the appendix to his brief.  Funderburk responds that we should not consider these excerpts because they were not presented to the trial court and are not part of the appellate record.  *See Guajardo v. Conwell*, 46 S.W.3d 862, 864 (Tex. 2001) (per curiam); *In re Estate of Bendtsen*, 230 S.W.3d 823, 830 (Tex. App.—Dallas 2007, pet. denied); *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 465 n.23 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).  Lewis responds that appellate courts regularly take judicial notice of such publications.  However, not one of the cases cited for this proposition by Lewis involved appellate review of the adequacy of an expert report under section 74.351 or its predecessor article 4590i.[2]  Moreover, considering

[2]      Lewis cites the following cases as support for his contention that we should take judicial notice of the contents of the textbook.  *Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 77 (Tex. 1997) (review of jury verdict); *Ex parte Briseno*, 135 S.W.3d 1, 5-6 (Tex. Crim. App. 2004) (postconviction habeas); *Grimes v. State*,

additional materials provided by the parties for the first time on appeal would be directly contrary to the settled scope of review in such appeals, namely, that the review is limited to the four corners of the report and the proffered expert's CV. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878; *Williams*, 264 S.W.3d at 891; *Mosely*, 249 S.W.3d at 779; *Mem'l Hermann Healthcare*, 230 S.W.3d at 758; *see also McAllen Med. Ctr.*, 51 Tex. Sup. Ct. J. at 1304, 2008 Tex. LEXIS, at *7-8. Therefore, we will not consider the excerpts provided by Lewis in the appendix to his brief.

An expert need not be certified in the same area of specialization as the defendant physician. *See Roberts*, 111 S.W.3d at 121; *Broders*, 924 S.W.2d at 153; *McKowen*, 263 S.W.3d at 165; *Keo*, 76 S.W.3d at 732; *Blan*, 7 S.W.3d at 745-46. Thus, Lewis's general argument that Hughes is not qualified because he is a family practitioner "ignores the plain language of [section 74.401(a)(2)], which focuses *not* on the defendant doctor's area of expertise, *but on the condition involved in the claim*." *Blan*, 7 S.W.3d at 746; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(2).

In the same vein, we reject Lewis's claim that Hughes is not qualified because his report does not indicate that he has any specialized knowledge regarding the particular treatments and procedures Lewis employed. The *condition* about which the Funderburks complain is Whitney's "malunited left distal radius fracture." Hughes does not opine that this condition was caused by "the closed reduction performed by Dr. Lewis, the application of a sugar tong splint, [or] the application of a short arm

---

135 S.W.3d 803, 821 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (criminal appeal); *Breckenridge v. State*, 40 S.W.3d 118, 123-24 (Tex. App.—San Antonio 2000, pet. ref'd) (criminal appeal); *Lemmon v. United Waste Sys., Inc.*, 958 S.W.2d 493, 498-99 (Tex. App.—Fort Worth 1997, pet. denied) (wrongful termination); *Bryant v. State*, 685 S.W.2d 472, 474 (Tex. App.—Fort Worth 1985, pet. ref'd) (criminal appeal).

cast," which are three of the four orthopedic procedures Lewis argues that Hughes lacks expertise in.[3]  Rather, Hughes opines that this malunion was caused by Lewis's failure to properly monitor Whitney's recovery via x-rays obtained at appropriate intervals "to indicate whether or not the fracture was properly healed."

At the time of the report, Hughes had been a family practitioner for twenty-three years.  His is necessarily a general practice, but it includes the provision of orthopedic care and, specifically, the treatment of wrist fractures.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c).  Thus, Hughes is qualified to offer an expert opinion regarding the appropriate standard of care for monitoring a patient as her wrist fracture heals.  *See McKowen*, 263 S.W.3d at 162-64 (specialist in infectious disease qualified to give opinion about cardiothoracic surgeon's failure to properly monitor patient after diagnosis of infection); *Keo*, 76 S.W.3d at 732-33 (otolaryngologist qualified to give opinion regarding appropriate postoperative procedures following cosmetic surgery); *Keeton v. Carrasco*, 53 S.W.3d 13, 25-26 (Tex. App.—San Antonio 2001, pet. denied) (physician who specialized in physical medicine, rehabilitation, and pain management qualified to give opinion regarding standard of care for post-operative infection following orthopedic surgery).

Finally, experts often rely on textbooks and other publications to guide them in determining the accepted standard of care.  *See, e.g., Roberts*, 111 S.W.3d at 122.  Thus,

---

[3]      The fourth procedure Lewis specifies is "x-ray imaging."  Hughes's opinion obviously does relate to the manner in which Lewis conducted x-ray imaging.  However, x-ray imaging is a procedure common to many medical fields.  *See Broders v. Heise*, 924 S.W.2d 148, 154 (Tex. 1996) (if subject of inquiry "is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields"); *accord Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

we cannot conclude that Hughes's reliance on the textbook he cited should be cause for concern.

Therefore, even assuming Hughes's qualifications to provide an expert opinion in this case are borderline (which we do not), we cannot say the court abused its discretion by finding Hughes to be sufficiently qualified to provide expert opinion regarding the manner in which Lewis monitored Whitney's recovery. *See Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam) ("Whether to exclude Bell's testimony is a close call on this record. Close calls must go to the trial court."). Accordingly, we overrule Lewis's first issue.

### Causation

Lewis contends in his second issue that Hughes's report is conclusory and insufficient to establish causation.

Section 74.351(r)(6) provides the requisites for a sufficient expert report.

> "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2008).

"The report need only represent a good-faith effort to provide a *fair* summary of the expert's opinions." *Wooten v. Samlowski*, No. 10-07-00305-CV, 2008 Tex. App. LEXIS 3709, at *4 (Tex. App.—Waco May 21, 2008, pet. filed) (citing *Palacios*, 46 S.W.3d at 878); *accord Gray v. CHCA Bayshore, L.P.*, 189 S.W.3d 855, 858-59 (Tex. App.—Houston [1st

Dist.] 2006, no pet.); *Gallardo v. Ugarte*, 145 S.W.3d 272, 277 (Tex. App.—El Paso 2004, pet. denied); *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). To constitute a fair summary, the report "must set out what care was expected, but not given." *Palacios*, 46 S.W.3d at 880 (quoting *Palacios v. Am. Transitional Care Ctrs. of Tex., Inc.*, 4 S.W.3d 857, 865 (Tex. App.—Houston [1st Dist.] 1999) (Taft, J., dissenting)); *Gallardo*, 145 S.W.3d at 278. In other words, the report must provide "specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880; *Gray*, 189 S.W.3d at 859; *Gallardo*, 145 S.W.3d at 277-78.

Here, Hughes opines in his report that the applicable standard of care calls for x-rays at regular intervals to confirm the wrist fracture is healing properly and that "loss of position has not occurred." He states that Lewis deviated from this standard of care by failing to have x-rays taken at several specified points during the healing process and when the cast was removed. He concludes that "[t]hese deviations and breaches of the standard care [sic] were the proximate causes of the malunited left distal radius fracture."

Hughes's report is similar to reports found deficient in *Gray* and *Costello*. In *Gray*, the expert report faulted the doctor's failure to properly monitor the positioning of the plaintiff's knee. *See Gray*, 189 S.W.3d at 859. The First Court of Appeals found this insufficient to establish causation.

> Here, Dr. Toussaint's report contains only a general statement that appellees failed to monitor Gray's left knee properly. The report provides no specific information concerning what actions appellees should have

taken in the event they observed Gray's knee flexing. Indeed, a literal reading of the report's most direct statements concerning breach leads to the conclusion that simply monitoring Gray's extremities, and taking no corrective action, would have prevented her injury. In view of such general and conclusory statements concerning breach, we cannot conclude that the trial court abused its discretion in dismissing Gray's suit.

*Id.* at 859-60.

In *Costello*, the report faulted a hospital's failure to "appropriately triage[ ] and evaluate[ ]" the plaintiff. *See Costello*, 141 S.W.3d at 249. The San Antonio Court found this report insufficient to establish causation.

Dr. Schilling offers no explanation of what medical information a more timely triage and evaluation would have revealed, nor does he state what would have been done had Christus not failed to act, what treatment would have or could have been available, that the patient was a candidate for the unknown treatment, or that the unknown treatment could have or would have been effective. Dr. Schilling's report fails to state how Christus' failure to act was a substantial factor in bringing about Lozano's death and without which her death would not have occurred.

*Id.* at 249.

This Court reached a similar conclusion recently in *Wooten*.

These sections of Dr. Patman's otherwise well-detailed and specific report ultimately do not explain *how* Dr. Samlowki's alleged breaches caused Wooten's injury, harm, and damages (the multiple life-threatening complications, resultant multiple operations, multiple organ failure with permanent damage, multiple prolonged hospital admissions, and future medical care). From the overall gist of the report, we could infer—and it is almost obvious—that Dr. Patman is of the opinion that, had Dr. Samlowski not breached the standard of care, he more likely than not would have found the source of Wooten's acute abdomen in the beginning, and she in all reasonable medical probability would not have suffered such injury, harm, and damages. But we cannot make such an inference, nor can we fill in gaps by stating the obvious.

*Wooten*, 2008 Tex. App. LEXIS 3709, at *18-19.

Funderburk acknowledges this line of cases but argues that his case is more similar to the facts presented in *Gallardo* because the report in that case "indicated that if the proper steps had been taken the injury could have been prevented from occurring or progressing." He contends that this is analogous to Hughes's "opinions that had x-rays been taken as required by the standard of care that the alignment could have been monitor[ed] and maintained and the malunion and subsequent surgery avoid[ed]."

We do not agree with Funderburk's interpretation of Hughes's report. First, Hughes never states that, had Lewis conducted additional x-rays, a proper alignment for the fracture could have been "maintained." At best, Hughes opines that Lewis could have monitored the alignment with regular x-rays and inferentially would have detected any misalignment at an earlier stage in the healing process. However, a proffered expert report cannot be deemed sufficient because of inferences which may be drawn from its contents, even if those inferences are reasonable, logical, or even "obvious." *See Bowie Mem'l Hosp.*, 79 S.W.3d at 53; *Wooten*, 2008 Tex. App. LEXIS 3709, at *18-19; *Baylor Univ. Med. Ctr. v. Rosa*, 240 S.W.3d 565, 570 (Tex. App.—Dallas 2007, pet. denied).

Second, even if we could infer from Hughes's report that Lewis would have detected a misalignment if he had ordered more frequent x-rays, Hughes's report is completely silent about what Lewis could or should have done upon detecting a misalignment. *See Gray*, 189 S.W.3d at 859-60; *Costello*, 141 S.W.3d at 249; *see also Wooten*, 2008 Tex. App. LEXIS 3709, at *18-19. And this is what distinguishes Hughes's report from the report under consideration in *Gallardo*. In *Gallardo*, the plaintiff's expert

not only faulted the nurse for failing to monitor the patient every two hours to ensure that he changed his position in the bed (to prevent decubitus ulcers), but also indicated additional steps that could be taken to prevent the formation of ulcers including "padding his bed and applying Granulex spray." *See Gallardo*, 145 S.W.3d at 279. As the Court explained, the report "adequately convey[ed] the idea that failure to take the proper steps caused the decubitus or caused it to get worse." *Id.* at 280.

Here, Hughes explained how Lewis failed to detect a misalignment, which inferentially preceded the malunion, but he did not explain what Lewis could or should have done about it upon making this discovery. Therefore, we hold that Hughes's report does not constitute a good-faith effort to provide a fair summary of the causal relationship between Lewis's failure to monitor the fracture as it healed and the malunited fracture. Accordingly, we sustain Lewis's second issue.

### Appropriate Disposition

Lewis contends that, because Funderburk has already been granted the opportunity to file an amended expert report, this Court should render judgment dismissing Funderburk's claims but remand the case to the trial court for the award of costs and attorney's fees.

Lewis requested costs and attorney's fees in his trial pleadings. *Cf. Victoria Gardens of Frisco v. Walrath*, 257 S.W.3d 284, 291 (Tex. App.—Dallas 2008, pet. denied) (defendant's prayer for general relief insufficient to preserve right to recover costs and attorney's fees under section 74.351(b)(1)). Under section 74.351(b)(1), the trial court has a duty to award costs and attorney's fees in this instance. *See* TEX. CIV. PRAC. & REM.

CODE ANN. § 74.351(b)(1) (Vernon Supp. 2008); *Boothe v. Dixon*, 180 S.W.3d 915, 921 (Tex. App.—Dallas 2005, no pet.).

Therefore, we reverse the trial court's order denying Lewis's motion to dismiss and render a judgment of dismissal.  In addition, we remand this cause to the trial court for a hearing solely to determine the amount of attorney's fees and costs to be awarded to Lewis.  *See Bogar v. Esparza*, 257 S.W.3d 354, 373 (Tex. App.—Austin 2008, no pet.); *Boothe*, 180 S.W.3d at 921.


FELIPE REYNA
Justice

Before Chief Justice Gray,
        Justice Vance, and
        Justice Reyna
        (Chief Justice Gray concurring with note)*
Reversed and Rendered in part,
        Reversed and Remanded in part
Opinion delivered and filed December 31, 2008
[CV06]


\*        (Chief Justice Gray concurs in the judgment and in the opinion with regard to the disposition of issues of the adequacy of the report and attorney's fees.  He does not join the opinion on the issue of qualifications because it is not necessary to a disposition of the appeal and thus is seven pages of dicta.  A separate opinion will not issue.)